## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| JOSEPH CANADA | : | |
| 1 Gooseneck Road | : | CIVIL ACTION |
| Levittown, PA 19057 | : | |
| | : | NO.: 19-1790 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| SAMUEL GROSSI & SONS, INC. | : | |
| 2526 State Road | : | |
| Bensalem, PA 19020 | : | |
| | : | |
| Defendant. | : | |

_____:

## SECOND AMENDED CIVIL ACTION COMPLAINT

Joseph Canada (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      Plaintiff has initiated this action to redress violations by Samuel Grossi & Sons, Inc. (*hereinafter* referred to as "Defendant") of Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000(d) *et seq.*), Section 1981 of the Civil Rights Act of 1866 ("Section 1981" – 42 U.S.C. § 1981), the Americans with Disabilities Act, as amended ("ADA" – 42 U.S.C. §§ 12101 *et. seq.*), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et. seq.*), the Pennsylvania Human Relations Act ("PHRA") and other applicable state laws.[1]  As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

_____

[1] Plaintiff's claims under the PHRA are referenced herein for notice purposes.  He is required to wait 1 full year before initiating a lawsuit from date of dual-filing with the EEOC.  Plaintiff must however file his lawsuit in advance of same because of the date of issuance of his federal right right-to-sue letter under Title VII and the ADA.  Plaintiff's PHRA claims however will mirror identically his federal claims under Title VII and the ADA.

## JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws.

3.     This Court may properly assert personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4.     Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendant is deemed to reside where it is subjected to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

5.     Plaintiff is proceeding herein under Title VII and the ADA after properly exhausting all administrative remedies with respect to such claims by timely filing Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing lawsuits within ninety ("90") days of receiving notices of dismissal and/or right to sue letters from the EEOC.

## PARTIES

6.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.     Plaintiff is an adult individual with an address as set forth in the caption.

8.      Samuel Grossi & Sons, Inc. operates as a steel producer, offering engineering, detailing, erection, estimating, and structural steel painting services to customers in Pennsylvania, with an address as set forth in the caption.

9.      At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendant.

## FACTUAL BACKGROUND

10.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.     Plaintiff is a black (African-American) male.

12.     Plaintiff worked for Defendant for approximately 11 years until his second unlawful termination (as discussed *infra*) by way of letter dated August 2, 2019.

13.     During his employment with Defendant, Plaintiff performed several different labor roles, including but not limited to painting and machine operator.

14.     Plaintiff was primarily supervised by Director of Operations, Eddie Thompson (*hereinafter* "Thompson") and foreman, Joe Beck (*hereinafter* "Beck"); and indirectly supervised by owners John Grossi (*hereinafter* "JG") and Eugene Grossi (*hereinafter* "EG").

15.     Plaintiff was also supervised through Human Resources, in particular by Elena (last name unknown, *hereinafter* "Elena"), who is believed to be in a relationship with JG.

16.     The foregoing management (*see* paragraphs 14 and 15) are Caucasian (and non-black).

17.     Throughout his tenure with Defendant, Plaintiff was a hard-working employee who performed his job well.

**-Race Discrimination-**

18.     Upon Plaintiff's observations and beliefs, Defendant's work environment has been disparate and unfairly harsh towards black employees.

19.     Throughout the course of his employment with Defendant, Plaintiff and other black employees were subjected to racial discrimination, racial slurs, and harassment by Defendant's non-black management and co-workers.  By way of example, but not intended to be an exhaustive list:

> a.   Plaintiff's Caucasian (non-black) co-worker Steve (last name unknown, *hereinafter* "Steve") called Plaintiff a "nigger" on at least two occasions, including shortly before Plaintiff's first termination on or about March 4, 2019;
>
> b.   Other members of Defendant's non-black management and employees, including but not limited to Beck, routinely used racially derogatory language, i.e. "nigger" in the workplace;
>
> c.   Upon information and belief, Defendant's non-black management unfairly terminated and failed to reinstate black employees despite their seniority;
>
> d.   Unlike Plaintiff's non-black co-workers, Defendant's non-black management, including Thompson, Beck, and Elena treated Plaintiff and other black employees in a rude and demeaning manner, and regularly talked down to them;
>
> e.   Unlike Plaintiff's non-black co-workers, Defendant's non-black management, including Thompson, Beck, and Elena, selectively enforced policies against and unfairly disciplined Plaintiff and other black employees.  For example, in or about January of 2019, Elena assessed six points against Plaintiff and provided

him with a write-up for taking two personal days even though Elena had approved the personal days several months prior.

20.    As a result of the discriminatory and disparate treatment that Plaintiff was being subjected to because of his race, Plaintiff complained to Defendant's non-black management, including but not limited to JG, EG, and Elena, on at least 4-5 occasions throughout his last year with Defendant.

21.    Despite Plaintiff's aforesaid complaints of discrimination, Defendant failed to meaningfully investigate or resolve such concerns.  By way of example, but not intended to be an exhaustive list:

    a.   Plaintiff initially complained to JG about being called a "nigger" by Steve (months prior to Plaintiff's termination).   Steve was initially suspended but was not terminated and continued to subject Plaintiff to racial slurs.

    b.   In or about early 2019, Plaintiff complained to Elena about being called a "nigger" again by Steve.  Elena responded by stating that she has "dated a black guy" so she even uses the term "nigger," as if it were not racially offensive.

22.    Rather than meaningfully investigate or take prompt remedial action regarding Plaintiff's concerns of racial discrimination, Defendant's non-black management, including but not limited to Thompson, Beck, and Elena, continued to subject Plaintiff to hostility and animosity through verbal reprimands and disparate treatment.  For example, but not intended to be an exhaustive list:

    a.   Defendant's non-black management, including but not limited to Thompson, Beck, and Elena, increasingly criticized and scrutinized Plaintiff's work;

    b.   Defendant's non-black management, including but not limited to Thompson, Beck, and Elena increasingly talked down to Plaintiff; and

    c.   A few weeks prior to Plaintiff's first termination, Elena called a meeting for all employees to discuss an offensive text that had been sent to her by an unknown number.  Elena stared solely at Plaintiff for the duration of the meeting and while staring directly at him, yelled "I am not taking this bullshit; I have a f***ing gun, and I will f***ing shoot you."  Plaintiff's union filed a police report on his behalf.[2]

23.    As a result of Defendant's non-black management's failure to investigate his claims of harassment and retaliation, Plaintiff complained to Defendant's non-black management, including but not limited to EG, that he believed the negative treatment he was receiving from Elena and others was in retaliation for his prior complaints of race discrimination, but EG ignored his concerns.

24.    Despite Plaintiff's repeated complaints of race discrimination and retaliation to Defendant's non-black management, Defendant's non-black management continued to subject Plaintiff to animosity and hostility through disparate treatment and pretextual admonishment.

25.    As a result of Defendant's non-black management's continued animosity and hostility, Plaintiff complained again to Elena, just two weeks prior to his first termination, that he believed she treated Plaintiff and other black employees unfairly, but she dismissed his concerns.

26.    On or about March 4, 2019, Plaintiff was abruptly informed that he was being laid off for lack of work; however, Defendant retained several non-black employees who were less senior than Plaintiff.

---

[2] Upon Plaintiff's information and belief, it was determined weeks later that a Caucasian (non-black) employee sent the offensive text to Elena.

27.     After being informed on or about March 4, 2019 that he was being laid off for lack of work, Plaintiff approached Thompson and Beck about being permitted to "bump" a less senior employee from his position so that Plaintiff could remain employed with Defendant.

28.     In response to Plaintiff's request to "bump" a less senior employee from his position so that Plaintiff could remain employed with Defendant, Thompson responded "you are the only one not allowed to bump."  Plaintiff believes and therefore avers that Thompson's comment was in reference to his race because at least two other Caucasian (non-black) employees were permitted to "bump" other less senior employees and continue to work for Defendant.

29.     Following his termination and after threatening legal action (through his union), Plaintiff was permitted to return to work on or about March 6, 2019, but initially only to an inferior and demoted role (from machine operator to material handler), which is known to be a more labor intensive, harder, and entry level position.

30.     Upon his reinstatement on or about March 6, 2019, Plaintiff was pressured to sign a conditions of employment document, which Plaintiff also believes to be discriminatory and in retaliation for his complaints of race discrimination because other non-black employees who have been reinstated have not been asked to sign a conditions of employment document.[3]

31.     Shortly after his return to work on or about March 6, 2019, Plaintiff filed a charge of discrimination with the EEOC and PHRC outlining the discrimination and retaliation he had been experiencing.

---

[3] Plaintiff asserts herein that the mistreatment he was subjected to following his termination, including his demotion to a more labor intensive, harder, and remedial position as well as being asked to sign a conditions of employment document, was also retaliatory because a reasonable juror could find these challenged actions "materially adverse" to a reasonable employee.  *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 72 (2006) (holding reassignment of duties might have "dissuaded a reasonable worker from making or supporting a charge of discrimination").

32.     Following his reinstatement and the filing of charges of discrimination with the EEOC and PHRC, Plaintiff was subjected to increased hostility and animosity from Defendant's non-black management, including but not limited to Elena, because of his race and in retaliation for his complaints of race discrimination.  For example, but not intended to be an exhaustive list:

    a.  Defendant's non-black management, including Elena, continued to criticize and scrutinize Plaintiff's work;

    b.  Defendant's non-black management, including Elena continued to talk down to Plaintiff in a rude and demeaning manner;

    c.  Defendant's non-black management, including Elena ignored Plaintiff;

    d.  Defendant's non-black management, including Elena refused Plaintiff overtime opportunities;

    e.  Defendant's non-black management, including Elena selectively enforced policies against him and

    f.  Plaintiff was subjected to increased surveillance of his movements and conduct during work hours, with Defendant even placing a camera above his work station in a manner disparately from others.

33.     Due to the continued discriminatory and retaliatory treatment from Defendant's management, Plaintiff filed his original Complaint with this Court on or about April 25, 2019.

34.     Despite the filing of a formal Complaint, however, Defendant's retaliatory and discriminatory treatment, as outlined above, only continued and further intensified.

35.     Defendant's management additionally began to directly approach Plaintiff and threaten him about his aforementioned legal proceedings and encourage him to withdraw his legal

filings, even stating that Defendant would simply get other minority employees to testify against Plaintiff in order to win the case.

36.     Ultimately, Plaintiff was again terminated from Defendant for a second time by way of letter dated August 2, 2019.

37.     While Plaintiff was away on vacation from Defendant, Defendant's management cut the lock off of a storage locker Plaintiff had maintained with Defendant for a number of years and rummaged through Plaintiff personal effects contained therein, including his personal password protected cell phone.

38.      After going through Plaintiff's personal cell phone, including his text messages stored electronically therein, Plaintiff was then terminated by Defendant for a second time allegedly because of the content contained in some of the personal and private text messages stored in his personal phone.

39.     Defendant's management entered into Plaintiff's personal password protected cell phone, read his text messages, and upon information and belief shared some of those text messages with other individuals, all without Plaintiff's authorization or permission.

40.     Therefore, Plaintiff believes that he was subjected to pretextual discipline, a hostile work environment, terminated and reinstated but given a demoted role, and terminated a second time because of his race and in retaliation for his complaints of race discrimination.

## -Disability Discrimination-

41.     Separately and apart from the race discrimination, harassment, and retaliation that Plaintiff was subjected to during his employment with Defendant (discussed *supra*), Plaintiff was also subjected to discrimination and retaliation based on his serious health conditions.

42.     At all relevant times during Plaintiff's employment with Defendant, Plaintiff suffered from and continues to suffer from arthritis and herniated discs in his back (in addition to other complications).

43.     As a result of his aforesaid health conditions, Plaintiff experiences severe back pain and spasms, stiffness, and limited mobility, which (at times) limits his ability to perform some daily life activities, including but not limited to bending, lifting, and walking (among other daily life activities).

44.     Despite his aforesaid health conditions and limitations, Plaintiff was able to perform the duties of his job well with Defendant; however, Plaintiff did require some reasonable accommodations while employed with Defendant (as discussed *infra*).

45.     Plaintiff apprised Defendant's management, including but not limited to Thompson, Beck, and Elena of his aforesaid disabilities and need for medical accommodations on several occasions throughout and until the end of his employment with Defendant.

46.     For example, for the last few years of his employment with Defendant, Plaintiff informed Defendant's management that he required reasonable medical accommodations in the form of intermittent and block time off for doctor's appointments and to care for and treat his serious health conditions.

47.     Plaintiff's intermittent and block time off for his disabilities from in or about 2016 until a few weeks prior to Plaintiff's first termination on or about March 4, 2019 (discussed *supra*) consisted of one or two days here and there for which he used vacation time or unpaid leave. Plaintiff kept Defendant's management apprised of his need for this intermittent and block leave; but not withstanding Plaintiff's notifications of same, Defendant failed to designate such leave time as FMLA-qualifying intermittent and/or block absenteeism.

48.     Therefore, Defendant failed to follow proper notice, designation, and informational regulations of the FMLA.

49.     Furthermore, after requesting reasonable accommodations in the form of intermittent and block leave, Defendant's management subjected Plaintiff to hostility and animosity by treating Plaintiff in a rude and demeaning manner and clearly exhibiting frustration with Plaintiff's need to take time off from work in order to attend doctor's appointments and to treat and care for his serious health conditions.

50.     Approximately a few weeks prior to his termination from Defendant, Plaintiff began to experience a flareup of his aforesaid health conditions.

51.     During this time, Plaintiff learned on his own about his eligibility for FMLA leave.

52.     As a result of the flareup of his aforesaid health conditions a few weeks prior to his termination, Plaintiff apprised Defendant's management, including but not limited Elena, of his need for medical accommodations, and requested intermittent FMLA leave for doctors' appointments and treatment when needed for his serious health conditions.

53.     At the same time, Plaintiff also requested intermittent FMLA leave for doctors' appointments and treatment when needed for his wife's serious health conditions related to a broken knee (requiring surgery to install a plate and screws) sustained in a car accident and exacerbated in a subsequent slip and fall.

54.     On or about March 4, 2019, in close proximity to one of Plaintiff's requests for and/or utilization of a reasonable medical accommodation (discussed *supra*), Plaintiff was abruptly terminated from his employment with Defendant, as described above.

55.     Following his termination, Plaintiff was reinstated, through union intervention, but was initially reinstated only to an inferior and demoted role (from machine operator to material handler), which is known to be a more labor intensive, harder, and entry level position.

56.     As also described above, following his reinstatement, Plaintiff continued to utilize medical accommodations, and Defendant continued to subject him to hostility and animosity by Defendant's management through disparate treatment, pretextual admonishment, and increased surveillance of his movements and conduct during work hours because of his disabilities and for requesting and/or utilizing reasonable medical accommodations.

57.     After filing charges of discrimination and retaliation with the EEOC and PHRC, as well as his original Complaint, Plaintiff was subjected to increased hostility and animosity, and was terminated for a second time, as outlined *supra*.

58.     Plaintiff's second termination occurred in close proximity to Plaintiff's last utilization of accommodations and FMLA leave.

59.     Plaintiff therefore believes and avers that he was been subjected to a hostile work environment, terminated and reinstated but given a demoted role by Defendant, and ultimately terminated a second time due to (1) his known and/or perceived disabilities; (2) his record of impairment; (3) his requested accommodations (which constitutes illegal retaliation); (4) his complaints of discrimination and/or (5) Defendant's failure to accommodate Plaintiff.

**COUNT I**
**Violation of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**([1] Race Discrimination; [2] Retaliation; and [3] Hostile Work Environment)**

60.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

61.     During Plaintiff's employment with Defendant, he was subjected to discrimination and a hostile work environment through disparate treatment, pretextual discipline, and demeaning and/or derogatory comments, i.e. "nigger," and treatment because of his race and/or complaints of race discrimination.[4]

62.     Instead of investigating Plaintiff's aforesaid complaints of race discrimination, Defendant's non-black management ignored them and left his legitimate concerns unresolved.

63.     On or about March 4, 2019, shortly complaining of race discrimination and a hostile work environment to Defendant's non-black management, Plaintiff was abruptly terminated.

64.     On or about March 6, 2019, Plaintiff was reinstated but initially only to an inferior and demoted role (from machine operator to material handler), which is known to be a more labor intensive, harder, and entry level position.

65.     Following his reinstatement and also after filing charges of discrimination and retaliation with the EEOC and PHRC, as well as the filing of his original Complaint, Plaintiff was subjected to increased hostility and animosity by Defendant's management through disparate treatment, pretextual admonishment, and increased surveillance of his movements and conduct during work hours and was ultimately terminated for a second time because of his race and/or his complaints about race discrimination.

66.     Plaintiff believes and therefore avers that he has been subjected to a hostile work environment, terminated and reinstated initially to an inferior and demoted role, and terminated a second time because of his race and/or his complaints about race discrimination.

67.     These actions as aforesaid constitute violations of Title VII.

---

[4] *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (holding that "it is clear that one such instance [of a supervisor using the 'n-word'] can suffice to state a claim" of hostile work environment).

**COUNT II**
**Violations of 42 U.S.C. Section 1981**
**([1] Race Discrimination; [2] Retaliation; and [3] Hostile Work Environment)**

68.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

69.     During Plaintiff's employment with Defendant, he was subjected to discrimination and a hostile work environment through disparate treatment, pretextual discipline, and demeaning and/or derogatory comments, i.e. "nigger," and treatment because of his race and/or complaints of race discrimination.

70.     Instead of investigating Plaintiff's aforesaid complaints of race discrimination, Defendant's non-black management ignored them and left his legitimate concerns unresolved.

71.     On or about March 4, 2019, shortly after complaining of race discrimination and a hostile work environment to Defendant's non-black management, Plaintiff was abruptly terminated.

72.     On or about March 6, 2019, Plaintiff was reinstated but initially only to an inferior and demoted role (from machine operator to material handler), which is known to be a more labor intensive, harder, and entry level position.

73.     Following his reinstatement and also after filing charges of discrimination and retaliation with the EEOC and PHRC, as well as the filing of his original Complaint, Plaintiff was subjected to increased hostility and animosity by Defendant's management through disparate treatment, pretextual admonishment, and increased surveillance of his movements and conduct during work hours and was ultimately terminated for a second time because of his race and/or his complaints about race discrimination.

74.     Plaintiff believes and therefore avers that he has been subjected to a hostile work environment, terminated and reinstated initially to an inferior and demoted role, and terminated a second time because of his race and/or his complaints about race discrimination.

75.     These actions as aforesaid constitute unlawful discrimination, retaliation and a hostile work environment under Section 1981.

**COUNT III**
**Violations of the Americans with Disabilities Act, as Amended ("ADA")**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation;**
**[3] Hostile Work Environment; and [4] Failure to Accommodate)**

76.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

77.     Plaintiff suffered from qualifying health conditions under the ADA which affected his ability (at times) to perform some daily life activities including, but not limited to bending, lifting, and walking.

78.     Plaintiff kept Defendant's management informed of his serious medical conditions and need for medical treatment and other accommodations.

79.     Despite Plaintiff's aforementioned health conditions and limitations, he was still able to perform the duties of his job well with Defendant; however, Plaintiff did require reasonable medical accommodations at times.

80.     Plaintiff requested reasonable accommodations from Defendant, including but not limited to intermittent and block time off from work to care for and treat for his serious health conditions.

81.     On or about March 4, 2019, in close proximity to Plaintiff's request and/or utilization of a reasonable medical accommodation (i.e. intermittent time off to care for his serious health conditions), Plaintiff was abruptly terminated from his employment with Defendant.

82.     Following his termination, Plaintiff was reinstated, through union intervention, but initially only to an inferior and demoted role.

83.     Following his reinstatement and also after filing charges of discrimination and retaliation with the EEOC and PHRC, as well as the filing of his original Complaint, Plaintiff was subjected to increased hostility and animosity by Defendant's management through disparate treatment, pretextual admonishment, and increased surveillance of his movements and conduct during work hours and was ultimately terminated for a second time because of his disabilities for requesting and/or utilizing reasonable medical accommodations, and for complaining of discrimination/retaliation.

84.     Plaintiff believes and therefore avers that he was subjected to a hostile work environment because of: (1) his known and/or perceived health problems; (2) his record of impairment; (3) in retaliation for his requested accommodations through disparate treatment, demeaning and/or discriminatory treatment toward him; and (4) in retaliation for his complaints of disability discrimination/retaliation.

85.     Plaintiff believes and therefore avers that he was terminated, reinstated initially to a demoted position, and terminated a second time by Defendant due to (1) his known and/or perceived disabilities; (2) his record of impairment; (3) his requested accommodations (which constitutes illegal retaliation); (4) Defendant's failure to accommodate Plaintiff; and/or (5) in retaliation for his complaints of disability discrimination/retaliation.

86.     These actions as aforesaid constitute violations of the ADA.

**COUNT IV**
**Violations of the Family and Medical Leave Act ("FMLA")**
**(Retaliation & Interference)**

87.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

88.     Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

89.     Plaintiff requested leave for medical reasons from Defendant, his employer, with whom he had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

90.     Plaintiff had at least 1,250 hours of service with Defendant during his last full year of employment.

91.     Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

92.     Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block or intermittent basis.

93.     Plaintiff's intermittent and block time off for his disabilities from in or about 2016 until a few weeks prior to Plaintiff's first termination on or about March 4, 2019, which consisted of one or two days here and there for which he used vacation time or unpaid leave, constituted FMLA-qualifying leave.

94.     Plaintiff submitted intermittent FMLA paperwork for doctor's visits and to care for and treat both his and his wife's serious health conditions just a few weeks prior to his first termination.

17

95.     Plaintiff continued to use FMLA leave (a reasonable accommodation) following his reinstatement, the last of which was utilized in close proximity to his second termination from Defendant.

96.     Defendant committed interference and retaliation violations of the FMLA by: (1) terminating Plaintiff twice for requesting and/or exercising his FMLA rights and/or for taking FMLA-qualifying leave; (2) by considering Plaintiff's FMLA leave needs in making the decisions to terminate him; (3) terminating Plaintiff to intimidate him and/or prevent him from taking FMLA- qualifying leave in the future; (4) terminating Plaintiff for making complaints of FMLA violations; (5 by making negative comments and/or taking actions towards him that would dissuade a reasonable person from exercising his rights under the FMLA, including filing a lawsuit; and (6) failing to designate Plaintiff's requests for time off from in or about 2016 until a few weeks prior to his first termination as FMLA-qualifying or FMLA protected leave.

97.     These actions as aforesaid constitute violations of the FMLA.

**COUNT V**
**Violations of 18 Pa.C.S. § 5741**
**(Unlawful Access to Stored Communications)**

98.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

99.     Defendant improperly obtained access to Plaintiff's electronically stored communications, including text messages, contained in Plaintiff's personal password protected cell phone without Plaintiff's permission or authorization, which Defendant asserts resulted in Plaintiff's termination.

100.    Pursuant to 18 Pa.C.S. § 5747, Plaintiff is entitled to civil remedies and damages as a result of Defendant's actions.

**COUNT VI**
**Violations of Pennsylvania Common Law**
**(Invasion of Privacy)**

101.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

102.     Defendant intentionally and improperly obtained access to Plaintiff's electronically stored data, including text messages and other private information, contained in Plaintiff's personal password protected cell phone without Plaintiff's permission or authorization, which upon information and belief Defendant has exposed to other unauthorized recipients and asserts resulted in Plaintiff's termination.

103.     This invasion of Plaintiff's personal password protected cell phone, including into his text messages which were private and contained conversations not shared with the public, was highly offensive to Plaintiff and would have otherwise been highly offense to any reasonable person.

104.     These actions as aforesaid constitute violations of Pennsylvania Common Law.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.     Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.     Plaintiff is to be awarded liquidated and/or punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish

Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

      D.     Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation); and

      E.     Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:    */s/ Timothy S. Seiler*
         Timothy S. Seiler, Esq.
         3331 Street Rd.
         Two Greenwood Square, Suite 128
         Bensalem, PA 19020
         (215) 639-0801

Dated:  November 8, 2019