**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOSEPH CANADA,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **SAMUEL GROSSI & SONS, INC.,** | **NO.  19-1790** |
| **Defendant.** | |

**DuBois, J.**                                                          **July 31, 2020**

**M E M O R A N D U M**

## I.    INTRODUCTION

Plaintiff, Joseph Canada, alleges in the Second Amended Complaint that defendant, Samuel Grossi & Sons, Inc. ("Grossi"), discriminated against him, retaliated against him, and subjected him to a hostile work environment because of his race and disability.  The Second Amended Complaint also sets forth claims of retaliation and interference with plaintiff's rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, unlawful access to stored communications, and unlawful invasion of plaintiff's privacy.  Presently before the Court is defendant's motion for summary judgment and plaintiff's motion for partial summary judgment. For the reasons set forth below, defendant's motion for summary judgment is granted and plaintiff's motion for partial summary judgment is denied.

## II.    BACKGROUND[1]

### A.  Plaintiff's Employment at Grossi

Plaintiff, a Black man, began his employment at Grossi, a steel producer, in 2009.  Def.'s Statement Undisputed Material Facts ¶ 1 [hereinafter Def.'s SUMF]; Second Am Compl. ¶ 8. Throughout the course of his employment, he held the positions of Helper, Painter, Saw Operator, and Material Handler.  Def.'s SUMF ¶ 1.  Plaintiff "was a member of a collective

---

[1]        The facts are presented in the light most favorable to plaintiff.  Disputed facts are noted as such.

bargaining unit represented by the Shopmen's Local Union No. 502 of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers" ("the Union").  *Id.* ¶ 2.  The terms and conditions of plaintiff's employment were governed by both a Collective Bargaining Agreement and Grossi's Employee Conduct and Disciplinary Action Policy that was provided to plaintiff.  *Id.* ¶¶ 2-3, 74.

### B.  Plaintiff's Back Problems and FMLA Leave

Plaintiff suffers from "serious back problems" including herniated discs and arthritis in his back.  Pl.'s Counter Statement Mat. & Disputed Facts ¶ 43 [hereinafter Pl.'s SUMF]. Plaintiff informed defendant of his back problems and need for medical accommodation.  *Id.* ¶ 48.  Plaintiff testified that defendant never provided him with Family and Medical Leave Act ("FMLA") forms, so he obtained the forms himself and gave the executed forms to Elena Osorio, defendant's Director of Human Resources.  *Id.* ¶¶ 8, 50, 55; Canada Dep. 39:4-7; Def's SUMF ¶ 13.  Plaintiff stated that Osorio initially "didn't want to accept" his FMLA forms, but despite her initial reluctance, she eventually did so.  Canada Dep. 39:9-40:2; Pl.'s SUMF ¶¶ 58, 64. Plaintiff utilized FMLA leave "throughout the remainder of his employment."  Pl.'s SUMF ¶¶ 58, 64.  Osorio testified that she never approved FMLA leave for plaintiff and that he "took FMLA how he wanted, called out and said I'm calling out under my FMLA."  Osorio Dep. 51:4-8.  Osorio also said, she "just let [plaintiff] take his FMLA" leave, and that plaintiff was not assessed any attendance points for taking that leave.  *Id.* 53:20-23.  Attendance points were instituted in late 2018 as part of a "no-fault" attendance policy.  Def.'s SUMF ¶ 17.  "Under the policy, employees accumulate points for absences unless those absences are pre-approved or otherwise excused."  *Id.*

Plaintiff testified that "[e]very time I took off [under the FMLA], I was harassed when I came back to work," and there was "[a]lways an attitude."  Pl.'s SUMF ¶¶ 67-68.  He claims that Osorio would "talk nasty" to him after he returned from FMLA leave, and she would not respond to his messages when he informed her that he was taking time off under the FMLA.  *Id.* ¶ 72; Canada Dep. 51:20-52:6, 53:10-14.  According to plaintiff, on one occasion after taking FMLA leave, Joseph Beck, defendant's shop foreman/shop superintendent,[2] said "we really needed you yesterday. Why did you take off?"  Pl.'s SUMF ¶¶ 4, 6, 69.  On another occasion, Edward Thompson, defendant's Director of Operations, asked "why did you take off?"  *Id.* ¶¶ 4, 6, 69. Additionally, plaintiff testified that after he returned from FMLA leave, "[Beck and Thompson] wouldn't tell me anything; they wouldn't give me the work. They would just be pissed off and wouldn't give me my work orders. So I would have to guess what needed to be done."  *Id.* ¶ 70. Despite Beck and Thompson not giving plaintiff work orders, plaintiff stated that he was able to speak to the other machine operators to "figure it out," and "once [he] got into the flow, [he] just kept it moving, [and] did what [he] had to do."  Canada Dep. 50:13-19, 51:14-15.

### C.  Plaintiff's Evidence of Racial Discrimination and Hostile Work Environment Based on His Race

Plaintiff testified that from March 2018 until July 2019, Steve Carlberg, plaintiff's coworker, Osorio the human resources manager, and Beck, defendant's shop foreman/shop superintendent, all used the N-word.[3]  Pl.'s SUMF ¶¶ 12, 24, 31, 33, 37, 38-39.  However, plaintiff was only called the N-word by Carlberg.  *Id.* ¶¶ 15, 31.

Plaintiff testified that Carlberg called plaintiff the N-word twice.  *Id.* ¶¶ 15, 31.  In March of 2018, Carlberg called plaintiff a "fucking nigger" after plaintiff accidently knocked over

---

[2]     The parties dispute whether Beck was plaintiff's supervisor.
[3]     Plaintiff used the actual racial slur in his testimony.  *E.g.* Canada Dep. 93:2-8.  Where possible, the Court will not repeat this slur.

Carlberg's radio.  Pl.'s SUMF ¶ 15.  Plaintiff told Cheryl Thorpe, a human resources assistant, about the incident.  *Id.* ¶ 16.  Thereafter, John Grossi, the co-owner, president and CEO of Grossi, told plaintiff "[d]on't worry about it.  I'll take care of it."  *Id.* ¶ 7, 16.  John Grossi stated that Carlberg would be suspended for a day.  *Id.*  However, when Carlberg came into work the next day, apparently not suspended, plaintiff got into an argument with him and both men were sent home.  *Id.* ¶¶ 20-21.  Carlberg called plaintiff the N-word a second time in February 2019, for which he was given a final verbal warning.[4]  *Id.* ¶ 31; Pl.'s Ex. F.  Plaintiff also testified that on another occasion, he heard Carlberg say "I should have known the nigger took it.  A nigger ate my sandwich," not referring to plaintiff.  *Id.* ¶ 24.  Several other employees complained to Osorio about Carlberg's use of the N-word at that time, but he was not disciplined for the incident.  *Id.* ¶¶ 8, 25-26, 29.  Carlberg left his job at Grossi in February 2019.  *Id.* ¶ 35.

Plaintiff testified that he complained to Osorio in February of 2019 that Carlberg called him the N-word.  Canada Dep. 57:11-24.  According to plaintiff, Osorio told him, "[w]ell, you know, me and my sister, we dated black guys and I said, 'nigger' before."  *Id.*  Plaintiff also said Osorio "used the word 'nigger' free, like it was nothing."  *Id.* at 120:3-8.  Additionally, in February 2019, Osorio held a meeting with all the employees at Grossi because she had received harassing text messages.  Def.'s SUMF ¶ 54.  At that meeting, Osorio, apparently believing that plaintiff was sending her harassing text messages, told plaintiff to "stop fuckin' harassing me.  Stop texting me. I have a fuckin' gun, and I will fuckin' shoot you."  Canada Dep. 54:21-55:18.

Plaintiff also claims that other employees told him that Beck, defendant's shop foreman/shop superintendent, used the N-word twice.  Pl.'s SUMF ¶ 38.  First, plaintiff says it was reported that Beck told a crude story about sleeping with a Black woman and used the N-

---

[4]     Plaintiff disputes the "legitimacy" of the final verbal warning that was produced by defendant and insinuates that it was altered.  Pl.'s SUMF ¶¶ 215-16 ("[T]he entire details of behavior section is whited out, with new writing in a different, lighter pen color, outlining an incident between Carlberg and Mr. Canada.").

word in that story. *Id.* ¶ 38; Canada Dep. 75:7-13. When plaintiff spoke to Beck about the story, Beck admitted that he used the slur, apologized to plaintiff, and requested that he not report the incident to Gene Grossi, a co-owner of defendant. *Id.* ¶ 7; Canada Dep. 74-1:19, 75:17-20. Plaintiff did not report the incident. Canada Dep. 74-1:19. Second, plaintiff heard from co-employees that Beck used the N-word to describe players on the Philadelphia 76ers NBA basketball team when he was unable to give away tickets to a 76ers game. Pl.'s SUMF ¶ 39. Additionally, in July 2019, when plaintiff inquired about a joke Beck had just told a coworker, Beck responded, "I was just telling Brian Baxter how I hate black jelly beans. I fuckin' hate them. I just hate black fuckin' jelly beans." *Id.* ¶ 40. Plaintiff believed that Beck was referring to Black people. *Id.*

### D. Plaintiff's One-Day Layoff

Grossi occasionally orders temporary layoffs due to a lack of work. Def.'s SUMF ¶ 34. Temporary layoffs are governed by the Collective Bargaining Agreement and are scheduled in order of seniority. *Id.* ¶ 35. The Collective Bargaining Agreement "also contains a provision allowing employees laid off to 'bump' less senior employees in other job classifications they can perform." *Id.* ¶ 36. "Bumping is governed by the Collective Bargaining Agreement and, to bump someone with less seniority, one must be immediately able to perform the work." *Id.* ¶ 37.

In March 2019, due to a lack of available work, Grossi was forced to order temporary layoffs. *Id.* ¶ 38. "Based on the seniority provision in the Collective Bargaining Agreement, 23 employees, including Canada, were selected for layoff." *Id.* Plaintiff attempted to avoid the layoff by "bumping" his cousin, who worked in the paint shop. *Id.* ¶ 42. However, in October 2018, plaintiff provided defendant with a doctor's note that stated "Mr. Canada was seen in our ER today. He must be excused from working with zinc primer because of respiratory problems

when exposed to that agent." *Id.* ¶¶ 7, 43.  After receiving the October 2018 note, defendant removed plaintiff from the paint shop and assigned him to work as a Machine Operator.  *Id.* ¶ 7.  Approximately four months later, on February 20, 2019, plaintiff submitted a second doctor's note, written by a different physician, that stated: "Joseph Canada may work around paint."  Pl.'s Ex. F.  Plaintiff testified that he obtained the February 2019 doctor's note because he knew there was a layoff coming.  Canada Dep. 59:18-60:8, 66:8-12.  However, defendant did not accept the second doctor's note because "it [didn't] say anything about [plaintiff's] previous issue" and "the doctor that wrote [the second note didn't] have the medical history to approve this."  *Id.*  As a consequence, defendant refused to allow plaintiff to "bump" into the paint shop.  Def.'s SUMF ¶¶ 37, 43.

Defendant claims that plaintiff was temporarily laid off because he could not "bump" into a different position.  *Id.* ¶ 39.  Several Caucasian employees were also laid off.  *Id.*  After being laid off for one day, plaintiff returned to work as a Material Handler.  *Id.* ¶ 47.  "When he returned to work in the Material Handler position, Canada was paid the same pay rate, had all the same benefits, worked the same hours, had the same opportunities for advancement."  *Id.* ¶ 51.  "After several weeks, when the work increased again, Canada was able to move back into the Machine Operator role."  *Id.* ¶ 52.

### E.  Plaintiff's Termination

Plaintiff's termination was based on text messages which were found on a cellphone in a locker on defendant's shop floor.  *See id.* at ¶ 74; John Grossi Dep. 68:17-19.  Grossi "employees[, including plaintiff,] are given their own personal lockers in a private locker room where they keep their personal belongings, including their 'street clothes.'"  Def.'s SUMF ¶ 57; Canada Dep. 165:16-18.  In addition, "[o]n Defendant's shop floor, there are lockers located by

employee work stations."  Pl.'s SUMF ¶ 167.  Defendant describes the lockers on the shop floor as "tool locker[s]," where company tools are kept and shared among employees.  Def.'s SUMF ¶¶ 58-60; Beck Dep. 33:20-21.  These lockers on the shop floor were approximately "three foot by five foot;" a forklift or a crane was used when they had to be moved.  Def.'s SUMF ¶ 64; Beck Dep. 34:17-18.  Beck described the lockers on the shop floor as "permanent fixtures." Beck Dep. 34:7-11.

Plaintiff contends that the lockers on the shop floor "were not considered 'tool lockers'" and that Grossi did not have company tools.  Pl.'s SUMF ¶ 168; Canada Dep. 172:5-21. According to plaintiff, he used a locker on the shop floor to store his personal tools, clothes, union paperwork, and a Samsung cellphone.  Pl.'s SUMF ¶ 176; Canada Dep. 172:5-21. Plaintiff testified he was the only person who used that locker and other employees knew that he was the only person who used that locker.  Pl.'s SUMF ¶¶ 171, 173-74.  Plaintiff secured that locker with his personal lock even though lockers on the shop floor were to be secured with a lock supplied by Grossi.  *Id.* ¶ 174; Beck Dep. 35:21-36:1.

On July 31, 2019, while plaintiff was on vacation, the locker on the shop floor plaintiff was using had to be moved because it was blocking the view of a surveillance camera in that area of the shop floor.  Def.'s SUMF ¶ 63.  A Grossi employee cut the lock on the shop floor locker used by plaintiff in order to remove the items inside the locker before moving it.  Def.'s SUMF ¶ 66; Pl.'s SUMF ¶ 178.  Osorio testified that after the lock was cut, she and another employee removed various items from the locker including "company tools,[5] sweaters, . . . FMLA books, envelopes for the union, paper towels, and a cellphone."  Osorio Dep. 104:11-15.  Osorio said she believed the cellphone found in the locker was a company cellphone because Grossi had

---

[5]     Plaintiff disputes that Osorio found company tools in the shop floor locker.  Pl.'s Resp. Def.'s SUMF ¶ 67.

multiple phones go missing in the past and "[b]ecause it's a Samsung" and other employees were issued Samsung cellphones by Grossi.  Osorio Dep. 26:2-20, 105:11-106:14.  Osorio Dep. 105:11-23.  It turned out that the cellphone found by Osorio belonged to plaintiff.  Pl.'s SUMF ¶ 178.  Plaintiff's cellphone was locked, but Osorio unlocked it on her first attempt.  *Id.* 107:8-18.  Later, she and John Grossi searched plaintiff's cellphone to "find out if it was a company phone."  Def.'s SUMF ¶ 71; Osorio Dep. 108:17-19, 109:13-17.

Searches of employee's property were governed by Grossi's Employee Handbook, which stated:

> The Company may conduct inspections and searches on Company premises, including both Company property and property under the Company's control, and employees' personal property. The purpose of these inspections and searches are to prevent the unauthorized possession and use of drugs, alcohol, weapons, and harmful materials on Company premises, to prevent the theft and improper use of company property, and to ensure that the Company has access to its property at all times. Inspections and searches may be conducted when the Company has reasonable suspicion that an individual is involved in misconduct on Company premises.  The inspections and searches may be with or without notice.
>
> All areas of the Company's premises may be inspected and searched.   This includes, but is not limited to, offices, desks, closets, lockers, cabinets, files, computer files and documents. The Company may also inspect and search employees' personal property. This includes, but is not limited to, packages that employees may bring to or remove from the workplace. To prevent losses and to reduce the need for these searches, employees are discouraged from bringing unnecessary personal items to the workplace.

Def. Ex. B at Grossi 00452.

Osorio testified that she does not remember whether "there was any reason to suspect that [plaintiff] was involved in any type of misconduct on company premises before his separation." Osorio Dep. 39:18-22.  Thompson testified that, prior to plaintiff's termination, he did not have

any reason to suspect that plaintiff committed any type of misconduct on company premises. Thompson Dep. 56:16-20.

During their search of plaintiff's cellphone, Osorio and John Grossi discovered text messages from plaintiff, in which he appeared to solicit prostitutes and negotiate the price for various sex acts.[6]  Def.'s SUMF ¶ 72; Canada Dep. 193:11-193:24 (admitting to negotiating prices).  "Osorio and [John] Grossi compared the text messages to Canada's time records and determined [in their opinion] that he had been soliciting prostitutes while at work and clocked in."  Def.'s SUMF ¶ 73.

Plaintiff's employment at Grossi was immediately terminated for soliciting prostitutes on company time in violation of Grossi's Employee Conduct and Disciplinary Action Policy, which prohibits: "[u]nlawful conduct which adversely affects the employee's relationship on his/her job, fellow employees, supervisor and/or damages the Company's property, reputation or goodwill in the community" and "[i]mmoral or indecent conduct."  *See id.* at ¶ 74; John Grossi Dep. 68:17-19.  Plaintiff denies that he was soliciting prostitutes.  Canada Dep. 184:19.  He insists that he never met with any of the women and that it was merely "dumb entertainment" and "pure entertainment."  *Id.*185:1-6, 197:20-198:1.

### F.  Procedural History

On March 8, 2019, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race and disability discrimination.  Pl.'s Ex. R.  On April 25, 2019, plaintiff filed the Complaint in this action and asserted the following claims: race discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act

---

[6]    Some examples of plaintiff's text messages are as follows: on June 22, 2018, plaintiff texted "how much for unwrapped BJ?" which referred to oral sex without a condom.  Canada Dep. 188:18-189: 193:24.  The response was "A hundred."  *Id.* 189:4-5. Plaintiff replied "Too much. Sorry. I'm good."  *Id.* 189:6-8.  On July 11, 2018, plaintiff texted a different number asking, "how much for unwrapped BJ?"  *Id.* 191:2-5.  The response was "60," and plaintiff replied, "Where are you located."  *Id.*

of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I); race discrimination, retaliation, and hostile work environment under 42 U.S.C. § 1981 (Count II); actual and perceived disability discrimination, retaliation, hostile work environment, and failure to accommodate[7] under the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 *et seq.* (Count III); retaliation and unlawful interference under the FMLA 29 U.S.C. § 2601 *et seq.* (Count IV); unlawful access to stored communications pursuant to Subchapter C of Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("Pennsylvania SCA") 18 Pa. Cons. Stat. § 5741 *et seq.* (Count V); and invasion of privacy (Count VI).  On March 13, 2020, defendant moved for summary judgment on all claims.  Plaintiff responded on April 10, 2020.  Plaintiff moved for partial summary judgment on March 13, 2020.  Defendant responded on April 10, 2020.  Plaintiff filed a Reply in support of his partial motion for summary judgment on April 16, 2020.  The motions are thus ripe for decision.

## III.   LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material when it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

---

[7]   In his response to defendant's motion for summary judgment, plaintiff stated that he "does not intend to proceed with" his failure to accommodate claim. Pl.'s Opp'n at 4 n.2.  Accordingly, the Court grants defendant's motion for summary judgment with respect to plaintiff's failure to accommodate claim under the ADA (Count III) by agreement.  *See Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of those causes of action and essentially acts as a waiver of these issues.'").

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.  However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.*  In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment[] and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof.  *Celotex Corp.*, 477 U.S. at 322.

## IV.   DISCUSSION

Defendant moved for summary judgment on all of plaintiff's claims.  Plaintiff moved for partial summary judgment on his perceived disability discrimination claim under the ADA (Count III), unlawful access to stored communications claim pursuant to the Pennsylvania SCA (Count V), and invasion of privacy claim (Count VI).  The Court addresses each in turn.

### A.  Discrimination Under Title VII, § 1981, and the ADA (Counts I, II, and III) and Retaliation Under Title VII, § 1981, the ADA, and the FMLA (Counts I, II, III, and IV)

Plaintiff attempts to prove his discrimination claims under Title VII, § 1981, and the ADA (Counts I, II, and III) and his retaliation claims under Title VII, § 1981, the ADA, and the FMLA (Counts I, II, III, and IV) using indirect evidence.  Pl.'s Resp. at 5-6, 17.  Thus, those claims are analyzed under the under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) ("All retaliation and discrimination claims brought under Title VII . . . which rely on circumstantial evidence, are controlled by the three-step burden-shifting

framework set forth in *McDonnell Douglas*."); *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) (applying *McDonnell Douglas* to § 1981 racial discrimination claim); *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) (applying *McDonnell Douglas* to § 1981 retaliation claim); *Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 653 (W.D. Pa. 2018) ("[R]etaliation claims under the ADA are analyzed under the *McDonnell Douglas* framework.") (citing *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (applying *McDonnell Douglas* to ADA retaliation claim); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (applying *McDonnell Douglas* to FMLA retaliation claim).

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing "a *prima facie* case of discrimination or retaliation." *Tourtellotte*, 636 F. App'x at 842. If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory and nonretaliatory reason for the adverse employment action. *See Barker v. Boeing Co.*, 21 F. Supp. 3d 417, 423 (E.D. Pa. 2014), *aff'd*, 609 F. App'x 120 (3d Cir. 2015). If such a reason is proffered, the "burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Tourtellotte*, 636 F. App'x at 842. "Although the burden of production of evidence shifts, 'the plaintiff has the ultimate burden of persuasion at all times.'" *Butler v. Arctic Glacier USA*, 213 F. Supp. 3d 711, 716 (E.D. Pa. 2016) (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

i.   *Prima Facie* Case of Discrimination and Retaliation

Assuming *arguendo* that plaintiff can establish a *prima facie* case of discrimination under Title VII,[8] § 1981,[9] and the ADA,[10] and a *prima facie* case of retaliation under Title VII,[11] § 1981,[12] the ADA,[13] and the FMLA,[14] the Court concludes that plaintiff failed to show that defendant's proffered nondiscriminatory and nonretaliatory reason was pretextual.

ii.   Legitimate Nondiscriminatory and Nonretaliatory Reason

At the second step of the *McDonell Douglas* framework, the employer must articulate a legitimate, nondiscriminatory or nonretaliatory reason for the adverse employment action. *Tourtellotte*, 636 F. App'x at 842; *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). As discussed *supra*, there are two adverse employment actions at issue in this case: the one-day layoff in March 2019, and plaintiff's final termination. *See supra* Part II. With respect to plaintiff's one-day layoff, defendant claims that plaintiff was laid off due to a lack of available

---

[8]      "To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that he: (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and, (4) the circumstances of the adverse employment action imply discrimination." *Butler*, 213 F. Supp. 3d at 716.

[9]      To establish a *prima facie* case of discrimination under § 1981, "a plaintiff must show 1) that he or she belongs to a racial minority; 2) that he or she was qualified for the position in question; 3) that he or she was discharged; and 4) that he or she was terminated under circumstances that give rise to an inference of unlawful discrimination." *Wilson v. Blockbuster, Inc.*, 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008) (citing *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)).

[10]      "To establish a *prima facie case* of discrimination [under the ADA], a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

[11]      "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.'" *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006), as amended (Sept. 13, 2006).

[12]      "To establish a retaliation claim in violation of § 1981, a plaintiff must establish the following *prima facie* case: "(1) [he] engaged in [protected] activity . . .; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Castleberry*, 863 F.3d at 267.

[13]      "To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

[14]      "To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) [he] invoked her right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision, and (3) the adverse action was causally related to [his] invocation of rights. *Lichtenstein*, 691 F.3d at 301-02.

work.  Def.'s SUMF ¶ 38-39.  With respect to plaintiff's final termination, defendant asserts that

plaintiff's employment was terminated for soliciting prostitutes on company time in violation of

Grossi's Employee Conduct and Disciplinary Action Policy.  *See id.* at ¶ 74; John Grossi Dep.

68:17-19.  These explanations meet defendant's "relatively light burden" of production

under *McDonnell Douglas*.  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)

(citing *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994)).

      iii.    Pretext

Based on the evidence of legitimate nondiscriminatory and nonretaliatory reasons for

plaintiff's one-day layoff and final termination, the burden shifts back to plaintiff at the third step

of the *McDonnel Douglas* analysis to show that defendant's explanation is pretextual.

*Tourtellotte*, 636 F. App'x at 842.  To survive a motion for summary judgment, a nonmoving

plaintiff must submit evidence which: (1) "casts sufficient doubt upon each of the legitimate

reasons proffered by the defendant so that a factfinder could reasonably conclude that each

reason was a fabrication;" or (2) "allows the factfinder to infer that discrimination was more

likely than not a motivating or determinative cause of the adverse employment action."  *Fuentes*,

32 F.3d at 762.

With respect to his one-day layoff, plaintiff does not argue that defendant's reason for the

layoff—a lack of available work—was pretextual; instead, he asserts that defendant's refusal to

let him "bump" and avoid the layoff is evidence of discrimination and retaliation.  Pl.'s Resp. at

27.  The Court disagrees.  Defendant refused to allow plaintiff to "bump" into the paint shop

because in October 2018, he submitted a doctor's note that stated "[plaintiff] must be excused

from working with zinc primer because of respiratory problems when exposed to that agent."

Def.'s SUMF ¶ 7.  Thus, according to the October 2018 doctor's note, plaintiff was unable to

perform his cousin's job in the paint shop.  *See* Def.'s SUMF ¶ 37.  Nonetheless, plaintiff argues

that the second doctor's note that he obtained in anticipation of the layoff that merely stated,

"Joseph Canada may work around paint," Pl.'s Ex. F, should have superseded his October 2018

doctor's note and that defendant lacked a reasonable justification for refusing the second doctor's

note.  Pl.'s Resp. at 18-19; Pl.'s SUMF ¶ 111.  Again, the Court disagrees with plaintiff.

Defendant refused to accept the February 2019 doctor's note because "it [didn't] say anything

about [plaintiff's] previous issue" and "the doctor that wrote [the second note didn't] have the

medical history to approve this."  Pl.'s Ex. F.  The Court concludes that defendant's explanation

for refusing to accept the second doctor's note was not unreasonable.  No reasonable jury could

conclude that defendant's proffered nondiscriminatory and nonretaliatory reason for subjecting

plaintiff to a one-day layoff was pretextual.

    With respect to plaintiff's final termination, plaintiff argues that defendant's reason for

terminating his employment was pretextual because defendant's explanation for entering the

locker is "unbelievable" and that Osorio's reason for going through the phone "to find out if it

was a company phone" is also "unbelievable."  Pl.'s Resp. at 27-31.  However, these arguments

relate to the propriety of the search of plaintiff's cellphone, not whether defendant terminated

plaintiff's employment for appearing to solicit prostitutes while clocked in and on company

property.  Moreover, as discussed *infra*, the Court concludes that defendant did not unlawfully

invade plaintiff's privacy when it searched his cellphone.  Although plaintiff insists that he was

not soliciting prostitutes, Canada Dep. 184:19, there is no dispute that during the search of

plaintiff's cellphone, Osorio and John Grossi discovered text messages from plaintiff in which he

negotiated the price of various sex acts with several women.  Def.'s SUMF ¶ 72; Canada Dep.

188:10-193:24 (explaining the meaning of several of his text messages).  Plaintiff sent those text

messages "while at work and clocked in."  Def.'s SUMF ¶ 73.  Plaintiff's employment was

terminated immediately after this discovery.  *Id.*  No reasonable jury could conclude that

defendant's proffered nondiscriminatory and nonretaliatory reason for terminating plaintiff's

employment was pretextual.

> iv.   Plaintiff's Partial Motion for Summary Judgment on his Actual and Perceived
>       Disability Claim under the ADA

In plaintiff's motion for partial summary judgment and in his opposition to defendant's

motion for summary judgment, plaintiff asserts that defendant discriminated against him because

of a perceived disability based on "respiratory problems."  Pl.'s Resp. at 23; Pl.'s Partial Mot.

Summ. J. at 2.  However, in his Second Amended Complaint, plaintiff's disability discrimination

claim under the ADA is based on his "arthritis and herniated discs in his back"—not perceived

respiratory problems.  *See* Second Am. Compl. ¶¶ 41-59.  Plaintiff may not raise a claim on

summary judgment that was not pled in the Second Amended Complaint.  *See Liberty Lincoln-*

*Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 326 (3d Cir. 2012); *Turinski v. Local 104 Int'l*

*Ass'n of Fire Fighters*, 269 F. App'x 184, 189 (3d Cir. 2008); *Spence v. City of Phila.*, 147 F.

App'x 289, 292 (3d Cir. 2005); *myService Force, Inc. v. Am. Home Shield*, No. CIV.A. 10-6793,

2013 WL 180287, at *12 (E.D. Pa. Jan. 17, 2013).  Additionally, "plaintiff 'may not amend his

complaint through arguments in his brief in opposition to a motion for summary judgment.'"

*Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) (quoting *Shanahan v. City of Chi.*, 82

F.3d 776, 781 (7th Cir. 1996)).  Accordingly, plaintiff's disability discrimination claim under the

ADA based on a perceived disability caused by respiratory problems is improper at this stage of

the proceedings.

In his Reply, plaintiff's requests leave to amend the Second Amended Complaint

pursuant to Federal Rule of Civil Procedure 15(b)(2).  Pl.'s Reply at 3.  Federal Rule of Civil

Procedure 15(b)(2) provides for the amendment of a complaint during and after trial when "the adverse party allows a claim to be tried by explicit or implicit consent." *Swiatek v. Bemis Co.*, 542 F. App'x 183, 188 (3d Cir. 2013); Fed. R. Civ. Pro. 15(b)(2).  Circuit court are split as to whether Rule 15(b)(2) applies at the summary judgment stage, and the Third Circuit has not yet ruled on the issue.  *See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 326-27 n.7 (3d Cir. 2012) (detailing circuit split and declining to rule on whether Rule 15(b)(2) applies at the summary judgment stage).  This Court need not resolve the question whether Rule 15(b)(2) applies at the summary judgment stage because defendant has not explicitly or implicitly consented to plaintiff's perceived disability discrimination claim under the ADA based on respiratory problems.  *See Posey v. NJR Clean Energy Ventures Corp.*, No. CV146833FLWTJB, 2015 WL 6561236, at *2 n.1 (D.N.J. Oct. 29, 2015).  On this issue, the Court notes that defendant objected to the raising of the perceived disability discrimination claim based on respiratory problems by plaintiff in his motion for partial summary judgment and argued in its motion for summary judgment that this claim should be dismissed.  Moreover, the evidence of plaintiff's perceived disability claim based on respiratory problems was also relevant to his racial discrimination and retaliation claims.  *Cf. Addie v. Kjaer*, 737 F.3d 854, 867 (3d Cir. 2013) ("[A]n issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried.").  The Court therefore denies plaintiff's request for leave to amend the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(b)(2).  In denying plaintiff's request, the Court notes that he amended his Complaint on two prior occasions.

Plaintiff's motion for partial summary judgment with respect to his disability discrimination claim under the ADA (Count III) is denied.  Defendant's motion for summary judgment on plaintiff's discrimination claims under Title VII, § 1981, the ADA (Counts I, II, and III) and plaintiff's retaliation claims under Title VII, § 1981, the ADA, and the FMLA (Counts I, II, III, and IV) is granted.

## B. Hostile Work Environment Under Title VII and § 1981 (Counts I and II)[15]

Plaintiff asserts that he suffered a hostile work environment based on his race.  Second Am. Compl. ¶¶ 60-75.  "In order to establish a hostile work environment claim under Title VII, [plaintiff] must show that (1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001); *Mufti v. Aarsand & Co.*, 667 F. Supp. 2d 535, 544 (W.D. Pa. 2009).  "The work environment must have been so permeated with discriminatory conduct that it objectively altered Plaintiff's conditions of employment and created an 'abusive working environment.'" *Turner v. City of Phila.*, No. CV 16-4476, 2017 WL 3129622, at *6 (E.D. Pa. July 24, 2017) (quoting *Bumbarger v. New Enter. Stone & Lime Co.*, 170 F. Supp. 3d 801, 828 (W.D. Pa. 2016)).

"[O]ffhanded comments, and isolated incidents (unless extremely serious) cannot sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)).  The "conduct must be extreme." *Id.*  In determining whether the conduct at issue is sufficiently extreme, courts consider "the totality of the circumstances." *Id.*  The types of circumstances courts consider "may include the

---

[15]     The Court analyzes plaintiff's Title VII and § 1981 hostile work environment claims together because "[t]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009).

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 262-63 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Moreover, "[t]he threshold for pervasiveness and regularity of discriminatory conduct is high." *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014)

"For racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments." *Barbosa v. Tribune Co.*, No. CIV.A. 01-CV-1262, 2003 WL 22238984, at *3 (E.D. Pa. Sept. 25, 2003) (quoting *Al–Salem v. Bucks County Water & Sewer Auth.*, 1999 WL 167729, at *5 (E.D. Pa. May 25, 1999)). "Racial comments that are sporadic or part of casual conversation do not violate Title VII." *Id.* (quoting *Gharzouzi v. Nw. Human Servs. of Pa.*, 225 F. Supp. 2d 514, 534 (E.D. Pa. 2002)).

In this case, plaintiff testified that over the span of 16 months, three Grossi employees used the N-word six times, only four of which were in his presence. *See supra* Part II. However, only one employee, Carlberg, used the N-word in addressing plaintiff—two times over the span of 11 months. Pl.'s SUMF ¶¶ 15, 31. The Court notes that Carlberg was given a final verbal warning the second time he called plaintiff the N-word and resigned from Grossi a week later. *Id.* Although plaintiff testified that Osorio "used the word 'nigger' free, like it was nothing," Osorio did not call him the N-word. Canada Dep. 57:11-24; 120:3-8. Additionally, Beck reportedly told plaintiff that he hated black jellybeans, which plaintiff took to mean that Beck hated Black people. Pl.'s SUMF ¶ 40.

Although Carlberg used the N-word in addressing plaintiff on two occasions, Carlberg was plaintiff's coworker, not a supervisor, and the occasions were 11 months apart. These

comments, although admittedly racist, are insufficiently severe or pervasive to create a hostile

work environment.  *See Barbosa*, 2003 WL 22238984, at *3 (holding that seven sporadic

incidents of harassment including three where plaintiff was called a "fucking spic" over an 18

month period was insufficient to support hostile work environment claim); *King v. City of Phila.*,

66 F. App'x 300 (3d Cir. 2003) (affirming grant of summary judgment on hostile work

environment on the basis that the use of the word "nigger," one physical push, and one threat to

sabotage plaintiff's work record were "isolated and sporadic incidents" and did not demonstrate

a pervasive atmosphere of harassment); *but see Castleberry*, 863 F.3d at 264 (holding that a

"supervisor's single use of the 'n-word'" in front of plaintiffs and their non-African-American

coworkers within "the same breath" as "threats of termination (which ultimately occurred)"

"constitute[] severe conduct that could create a hostile work environment").

Osorio's offhand comment to plaintiff that she had used the N-word before," while

disrespectful and inappropriate, is not sufficiently extreme because she did not use the N-word in

addressing plaintiff.  She merely explained that she had used the word before.  *See Brown-

Baumbach v. B&B Auto., Inc.*, 437 F. App'x 129, 133 (3d Cir. 2011) ("[T]he mere utterance of

an epithet, . . . does not sufficiently affect the conditions of employment to implicate Title VII

liability.").  Also, plaintiff's testimony that Osorio "used the [N-word] free, like it was nothing"

does not support a hostile work environment claim because plaintiff presents no evidence that

Osorio made these additional comments in plaintiff's presence, or that they were directed at

plaintiff.  *See Caver*, 420 F.3d at 263; *Boyer v. Johnson Matthey, Inc.*, No. CIV.A. 02-CV-8382,

2005 WL 35893, at *15 (E.D. Pa. Jan. 6, 2005) ("The use of the term 'nigger,' which was not

made with respect to [plaintiff] and which was not used in his presence, although offensive, does

not constitute regular and pervasive harassment of [plaintiff].").  Moreover, Osorio's comment

that she would shoot plaintiff unless he stopped texting and harassing her cannot support plaintiff's hostile work environment based on his race because there is no evidence that this threat was based on plaintiff's race.

With respect to Beck, plaintiff was told by another employee that Beck using the N-word on two occasions.  Since Beck's comments were not made in his presence, and they were not directed at plaintiff, Pl.'s SUMF ¶¶ 38, 39, the comments do not support a hostile work environment claim.  *See Caver*, 420 F.3d at 263; *Boyer*, 2005 WL 35893, at *15.  Moreover, Beck's comment that he hated black jellybeans is not sufficiently extreme to affect the conditions of plaintiff's employment to implicate Title VII liability.  *See Brown-Baumbach*, 437 F. App'x at 133.

Viewing all of plaintiff's evidence under the totality of the circumstances, the Court concludes that it does not amount to severe or pervasive harassment based on plaintiff's race. Plaintiff's hostile work environment claim based on his race therefore fails as a matter of law. Accordingly, defendant's motion for summary judgment on plaintiff's hostile work environment under the Title VII and § 1981 (Counts I and II) is granted.

**C.  Hostile Work Environment Under the ADA (Count III)**

Plaintiff asserts that he was subjected to a hostile work environment based on his actual or perceived disability.  Pl.'s Resp. at 20.  Defendant argues that this claim fails because the conduct that plaintiff complains of was not sufficiently severe or pervasive.  Def.'s Mot. Summ. J. at 24.  The Court agrees with defendant on this issue.

"To succeed on a hostile work environment claim under the ADA, the employee must show the following five factors: '(1) [he] is a qualified individual with a disability under the ADA; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [his]

disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment; and (5) [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action.'" *Ballard-Carter v. Vanguard Grp.*, 703 F. App'x 149, 151 (3d Cir. 2017) (quoting *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999)). "In determining whether an environment is objectively hostile or abusive, the court considers all of the circumstances, including, 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Martin v. Allegheny Airlines, Inc.*, 126 F. Supp. 2d 809, 820 (M.D. Pa. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)), *aff'd*, 261 F.3d 492 (3d Cir. 2001).

Plaintiff testified that after he returned from FMLA leave for his disability, Beck and Thompson asked him why he took time off and would not give him any work orders, which required plaintiff to guess what work needed to be done. *Id.* ¶¶ 69-70.  Plaintiff also testified that, although Beck and Thompson failed to give him work orders, he was able to speak to the other machine operators to "figure it out," and "once [he] got into the flow, [he] just kept it moving, [and] did what [he] had to do."  Canada Dep. 50:13-19, 51:14-15.  A coworker asking plaintiff why he missed work is not evidence of a hostile work environment under the ADA, s*ee Walton*, 168 F.3d 661, 667 n.4, and Beck and Thompson's failure to give plaintiff work orders did not unreasonably interfere with his work performance because plaintiff was still able to "figure it out" and do "what [he] had to do."  Canada Dep. 50:13-19, 51:14-15.

Plaintiff also testified that Osorio "would find a way to call [him] up to the office and talk nasty to him" after he returned from FMLA leave.  *Id.* ¶ 72.  Plaintiff's alleged interactions with

Osorio after he returned from FMLA leave "appear to amount to no more than a personality

conflict, and '[i]nsensitivity alone does not amount to harassment; the ADA, like Title VII, is not

in effect a general civility code.'"  *Martin*, 126 F. Supp. 2d at 820 (quoting *Cannice v. Norwest*

*Bank Iowa N.A.*, 189 F.3d 723, 726 (8th Cir. 1999)); *Buffa v. New Jersey State Dep't of*

*Judiciary*, 56 F. App'x 571, 575-76 (3d Cir. 2003) ("This Court has previously ruled that

evidence demonstrating a poor relationship between an employer and an employee is not, by

itself, sufficient to sustain a hostile work environment claim.").  Thus, the Court concludes that

plaintiff failed to show that he was subjected to a hostile work environment based on his

disability.  Defendant's motion for summary judgment on plaintiff's hostile work environment

under the ADA (Count III) is granted.

### D.  Interference Under the FMLA (Count IV)

Plaintiff claims that defendant unlawfully interfered with his rights under the FMLA.

Pl.'s Resp. at 4.  Defendant argues that this claim fails because plaintiff "cannot identify any

FMLA leave to which he was denied, and thus, he suffered no prejudice in connection with the

alleged discouragement."  Def.'s Mot. Summ. J. at 28.  The Court agrees with defendant on this

issue.

To succeed on "a claim of interference under the FMLA, a plaintiff must establish: (1) he

or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to

the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave

notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was

denied benefits to which he or she was entitled under the FMLA."  *Drummer v. Hospital of Univ.*

*of Pa.*, No. CV 16-2982, 2020 WL 1922743, at *5 (E.D. Pa. Apr. 21, 2020) (quoting *Ross v.*

*Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014)).  An essential element of such a claim that

plaintiff must show is that he was denied benefits under the FMLA, and he has not done so.

*Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 246 (3d Cir. 2016)

("[Plaintiff] does not allege he was actually denied FMLA leave.  In fact, he concedes that he

was able to take time off to care for his mother.  Accordingly, the court was correct in granting

summary judgment against [plaintiff]."); *Ross*, 755 F.3d at 192 ("[W]e have made it plain that,

for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually

withheld.").

In this case, there is no evidence that plaintiff was denied leave under the FMLA.  Pl.'s

SUMF ¶¶ 58, 64.  Plaintiff admits that he utilized FMLA leave "throughout the remainder of his

employment."  *Id.*  Additionally, Osorio testified that plaintiff was not assessed attendance points

for taking FMLA leave, and plaintiff "took FMLA how he wanted, called out and said I'm

calling out under my FMLA."  Osorio Dep. 51:8-11; 53:20-23.  Because plaintiff has failed to

show that he was denied benefits under the FMLA, his FMLA interference claim fails.

Accordingly, defendant's motion for summary judgment on plaintiff's FMLA interference claim

(Count IV) is granted.

**E.  Unlawful Access to Stored Communications (Count V)**

In Count V of the Second Amended Complaint, plaintiff asserts that defendant

unlawfully accessed stored communications in violation of the Pennsylvania SCA, 18 Pa. Cons.

Stat. Ann. § 5741 *et. seq.*  Both parties moved for summary judgment on this claim.  Def.'s Mot.

Summ. J. at 28; Pl.'s Partial Mot. Summ. J. at 7.  Plaintiff argues that his "cell phone is clearly a

facility through which an electronic communication is provided[,] and his text messages were

obviously electronic communications in electronic storage."  Pl.'s Mot. Partial Summ. J. at 7-8.

The Court disagrees.

24

The Pennsylvania SCA is a criminal statute that provides civil relief for "any provider of electronic communication service, subscriber or customer" who is aggrieved by a violation of the statute.  18 Pa. Cons. Stat. Ann. § 5747(a).  Section 5741(a) states in relevant part:

> [I]t is an offense to obtain, alter or prevent authorized access to a wire or electronic communication while it is in electronic storage by intentionally:
> (1) accessing without authorization a facility through which an electronic communication service is provided; or
> (2) exceeding the scope of one's authorization to access the facility.

18 Pa. Cons. Stat. Ann. § 5741(a).  Although the Pennsylvania SCA does not define the term "facility," it does define the term "communication service."  18 Pa. Cons. Stat. Ann. § 5702.  The statute defines a "communication service" as "[a]ny service which provides to users the ability to send or receive wire or electronic communications."  *Id.*  This language "most naturally describes network service providers," not personal computing devices like computers and cellphones.  *Cf. In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 146 (3d Cir. 2015) (interpreting the definition of "electronic communication service" under the Federal Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, which is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications.").  Based on the plain language of the statute, the Court concludes that an individual's cellphone is not a "facility" under 18 Pa. Cons. Stat. Ann. § 5741(a) because a cellphone does not "provide[]" an electronic "communication service"—it merely enables the use of an electronic "communication service."

The Court's conclusion is supported by the numerous federal courts that have interpreted the Federal Stored Communications Act, ("Federal SCA") 18 U.S.C. § 2701 *et seq.*  The Pennsylvania SCA "parallels" the Federal SCA, s*ee Strategic Wealth Grp., LLC v. Canno*, No. CIV.A. 10-0321, 2011 WL 346592, at *3 (E.D. Pa. Feb. 4, 2011), and the two statutes are

worded nearly identically.  *Compare* 18 U.S.C. § 2701, *with* 18 Pa. Cons. Stat. Ann. § 5741.

Indeed, the Third Circuit has held that the analysis under both statutes is identical.  *Fraser v.*

*Nationwide Mut. Ins. Co.*, 352 F.3d 107, 114 n.9 (3d Cir. 2003), as amended (Jan. 20, 2004).

Like the Pennsylvania SCA, the Federal SCA does not define the term "facility."  *See* 18 U.S.C.

§ 2510.  However, several federal courts interpreting the Federal SCA have held that personal

electronic devices, such as cellphones and personal computers, are not facilities.  *In re Google*

*Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d at 146 (holding that "an individual's

personal computing device is not a facility through which an electronic communications service

is provided" under the Federal SCA); *Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 793 (5th Cir.

2012) (holding that a "home computer of an end user is not protected by the [Federal] SCA");

*Shefts v. Petrakis*, No. 10-CV-1104, 2013 WL 489610, at *3 (C.D. Ill. Feb. 8, 2013) (holding

that a cellphone is not a "facility" under the Federal SCA); *In re iPhone Application Litig.*, 844

F. Supp. 2d 1040, 1058 (N.D. Cal. 2012) (concluding that a laptop, computer, or mobile device is

not a "facility" under the Federal SCA).

     The above courts reasoned that "the relevant 'facilities' that the [Federal] SCA is

designed to protect are not computers that *enable* the use of an electronic communication

service, but instead are facilities that are *operated by* electronic communication service providers

and used to store and maintain electronic storage."  *Garcia*, 702 F.3d at 792 (quoting *Freedom*

*Banc Mortg. Servs., Inc. v. O'Harra*, No. 2:11–cv–01073, 2012 WL 3862209, at *9 (S.D. Ohio

Sept. 5, 2012)) (emphasis in original); *see also In re Nickelodeon Consumer Privacy Litig.*, 827

F.3d 262, 276 (3d Cir. 2016) ("[T]he [Federal SCA] aims to prevent potential intrusions on

individual privacy arising from illicit access to stored communications in remote computing

operations and large data banks that stored emails."); *In re Google Inc. Cookie Placement*

26

*Consumer Privacy Litig.*, 806 F.3d 125, 147 (3d Cir. 2015) ("The origin of the [Federal SCA] confirms that Congress crafted the statute to specifically protect information held by centralized communication providers."). Indeed, the Third Circuit "has concluded that 'facilities' under the [Federal] SCA are network service providers, which include 'telephone companies, internet or e-mail service providers, and bulletin board services.'" *Walker v. Coffey*, 956 F.3d 163, 168 (3d Cir. 2020) (quoting *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d at 146).

Plaintiff, relying exclusively on *Klump v. Nazareth Area School District*, 425 F. Supp. 2d 622 (E.D. Pa. 2006), argues that his "cell phone is clearly a facility through which an electronic communication is provided[,] and his text messages were obviously electronic communications in electronic storage." Pl.'s Mot. Partial Summ. J. at 7-8. The Court rejects this argument. In *Klump*, the court denied defendants' motion to dismiss with respect to plaintiff's unlawful access to communications claim under the Pennsylvania SCA based on defendants' search of plaintiff's cellphone. *Klump*, 425 F. Supp. 2d 622 at 634-35. But *Klump* does not support plaintiff's argument for several reasons. First, the court in *Klump* expressly noted that "[w]e decline to make any finding at this time as to the proper limits of the term 'facility'" under the Pennsylvania SCA. *Klump*, 425 F. Supp. 2d at 634 n.12. Second, *Klump* is distinguishable because it was based, in part, on the allegation that defendant's searched plaintiff's voicemail, which "would have been stored by his cell phone provider and not in the cell phone itself." *Id.* Thus, the *Klump* court concluded that "there may be facts which, proven by plaintiff, could support a claim under [the Pennsylvania SCA]." *Klump*, 425 F. Supp. 2d at 63. In this case however, there is no evidence that defendant searched plaintiff's voicemails—defendant only searched plaintiff's text messages, which were stored on his cellphone, not by his cellphone

provider.  *See* Pl.'s SUMF ¶ 191.  Moreover, although *Klump* is distinguishable, the Court notes that it is not binding on this Court.

Because a personal cellphone is not a facility under 18 Pa. Cons. Stat. Ann. § 5741, plaintiff's unlawful access to stored communications claim fails as a matter of law.  Accordingly, the Court grants defendant's motion for summary judgment on plaintiff's unlawful access to stored communications claim (Count V) and denies plaintiff's partial motion for summary judgment on that claim.

### F.  Invasion of Privacy (Intrusion Upon Seclusion) (Count VI)

Plaintiff asserts that defendant invaded his privacy by searching his locked cellphone. Second Am. Compl. ¶¶ 102-103.  "An action for invasion of privacy under Pennsylvania law is comprised of four distinct torts: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life and (4) publicity placing the person in a false light." *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 260 (3d Cir. 2004) (citing *Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984)); *Tagouma v. Investigative Consultant Servs., Inc.*, 4 A.3d 170, 174 (Pa. Super. Ct. 2010).  Plaintiff asserts that his invasion of privacy claim is one for "intrusion upon seclusion."  Pl.'s Partial Mot. Summ. J. at 11.  In response, defendant argues that plaintiff's intrusion upon seclusion claim fails because, *inter alia*, defendant did not act intentionally.  Def.'s Brief in Opp'n Pl.'s Mot. Partial Summ. J. at 16-17.  The Court agrees with defendant on this issue.

In order to succeed on his intrusion upon seclusion claim under Pennsylvania law, plaintiff must prove that defendant's "intrusion was (1) intentional; (2) upon the solitude or seclusion of the plaintiff, or his private affairs or concerns; and (3) substantial; and (4) highly offensive."  *Pacitti v. Durr*, No. CIV.A. 05-317, 2008 WL 793875, at *25 (W.D. Pa. Mar. 24,

2008), *aff'd,* 310 F. App'x 526 (3d Cir. 2009); *see also Tucker v. Merck & Co.*, 102 F. App'x

247, 256 (3d Cir. 2004). "[T]he intrusion, as well as the action, must be intentional." *O'Donnell

v. United States*, 891 F.2d 1079, 1083 (3d Cir. 1989).

In *O'Donnell*, the Third Circuit observed that "an 'intrusion upon seclusion' claim

usually involves a defendant who does not believe that he has either the necessary personal

permission or legal authority to do the intrusive act." 891 F.2d at 1083. Based on this

observation, the court "conclude[d] that an actor commits an intentional intrusion only if he

believes, or is substantially certain, that he lacks the necessary legal or personal permission to

commit the intrusive act." *Id.*; *see also Yates v. Commercial Index Bureau, Inc.*, 861 F. Supp. 2d

546, 552 (E.D. Pa. 2012); *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 572 (W.D. Pa.

2015). The Third Circuit went on to affirm the district court's entry of summary judgment in

favor of the defendant with respect to plaintiff's intrusion upon seclusion claim under

Pennsylvania law because "the [defendant] believed it had [plaintiff's] permission to release the

disputed record[, and plaintiff] offered no evidence to the contrary." *Id.* In sum, Third Circuit in

*O'Donnell* held that the lower court did not commit error in granting summary judgment in favor

of the defendant on the intrusion upon seclusion claim because "[t]here [was] no dispute of

material fact concerning the [defendant's] lack of any intention to invade the plaintiff's right to

seclusion and privacy." *Id.*

In this case, plaintiff's cellphone was stored in a locker on the shop floor, secured by

plaintiff's lock. Pl.'s SUMF ¶ 178. Grossi referred to this as a "tool locker" on defendant's shop

floor. Def.'s SUMF ¶¶ 58-60. Although plaintiff testified that he was the only person who used

this locker on the shop floor, it was not assigned to him by defendant. Pl.'s SUMF ¶¶ 169, 173.

Plaintiff's personal locker was in the locker room. *See* Def.'s SUMF ¶ 57. After cutting the lock

on the locker on the shop floor that plaintiff was using, Osorio found tools, paperwork, clothes, and a cellphone. Osorio Dep. 104:11-15. Osorio testified that she believed the cellphone found in the locker on the shop floor was a company cellphone because multiple Grossi company cellphones had gone missing in the past and "[b]ecause it's a Samsung" and other employees had been issued Samsung cellphones by Grossi. Osorio Dep. 26:2-20, 105:11-106:14. Although plaintiff's cellphone was locked, Osorio unlocked it on her first attempt, and she and John Grossi then searched the cellphone and the text messages stored on the cellphone to "find out if it was a company phone." Osorio Dep. 107:8-18, 108:17-19, 109:13-17. At the time of the search of the cellphone, Osorio believed she had the legal authority to do so as she thought she was searching a company cellphone. *Cf. O'Donnell*, 891 F.2d at 1083 (holding that the Veterans Administration did not act intentionally because it "believed it had [plaintiff's] permission."); *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 405 (E.D. Pa. 2011) (dismissing intrusion upon seclusion claim where plaintiff did not allege facts that defendant believed or was substantially certain "that he lack[ed] the necessary legal or personal permission"). There is no other evidence bearing on Osorio's intent at the time of the search. Thus, the Court concludes the search of the cellphone was not an intentional intrusion.

In response to this argument, plaintiff asserts that defendant's stated reason for searching his cellphone "is simply absurd and could not be believed by any reasonable jury." Pl.'s Partial Mot. Summ. J. at 8-10. Specifically, plaintiff argues, *inter alia*, that because his cellphone was found in a locker surrounded by his personal effects and secured by his lock, "any reasonable person" would have thought that the cellphone was a personal cellphone. *Id.* The Court disagrees. The Samsung cellphone was found in a large locker on defendant's shop floor, *see* Pl.'s SUMF ¶ 174, 178, not in plaintiff's personal locker in the locker room, *see* Canada Dep.

30

165:16-18.  Company cellphones had been lost in the past, and other employees were issued Samsung cellphones by Grossi.  *See* Osorio Dep. 26:2-20, 105:11-106:14.  Thus, Osorio's belief that the Samsung cellphone recovered from the locker on the shop floor was a company cellphone was not "absurd."  The Court rejects plaintiff's remaining arguments because they either implicitly assume Osorio knew the cellphone recovered from the locker on the shop floor belonged to plaintiff, and there is no such evidence, or they merely claim Osorio should have used a different, less intrusive, means to determine ownership of the cellphone, which the Court concludes was not required.  *See* Pl.'s Opp. Def.'s Mot. Summ. J. at 32-34.

Because defendant's search of plaintiff's cellphone was not an intentional intrusion, his invasion of privacy claim fails as a matter of law.  Accordingly, the Court grants defendant's motion for summary judgment on plaintiff's invasion of privacy claim (Count VI) and denies plaintiff's partial motion for summary judgment on that claim.

## V.   CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's motion for partial summary judgment is denied.

An appropriate Order follows.